So we've heard your philosophy now, so you don't need to review it. I know. I think you asked, but I usually don't really want to hear it. This case is pretty straightforward. It doesn't have a lot of bells and whistles. It's about wage disparity. My wife worked at Harrah's. A man who worked at Harrah's got paid more money than she did. Still in the same job. She complained. They kind of didn't like it. They did make some adjustments. Then she complained some more. When she got promoted to what they called a dual position, then she got dual authority sometimes in a regular place. Can I ask you a question about that? In October of 2001, was Ms. Thaler's salary greater than or as great as any male supervisor or any male employed as a dual-rate supervisor? Prior to her being a dual-rate supervisor? In October 2001. I can't answer that question correctly. I'd have to refer to the specifics. What the situation here is, she always got less money than the people that were doing the same job as her. And where it becomes significant in what phase of litigation is when she becomes a dual-rate supervisor and then some time later, he fell in dispute with her for that job, becomes a dual-rate supervisor. He gets paid more, above $35,000, I think. Right, but there's a time period that goes. In my understanding in the record, while I don't know the exact amount, it's undisputed that there's over, is it like two years or something, something like that between when he becomes a dual-rate supervisor and when she was. And though I don't think we know the exact amount, it's undisputed that people were being paid more as dual-rate supervisors than when she was, right? That's the contention that Harris makes. Well, where is it disputed? I mean, we're in the record. That fact is not disputed. They're using that to say that there wasn't a disparity there between men and women. It's a prime case case that she's getting the pay cuts. They say we have reasons, we have exceptions. Their two exceptions are he becomes a dual-rate later in time and later in time we're getting more for this position. Of course, she hasn't received any raises. She's doing the position. They don't want to talk about that. Why would she have to speak at a current rate? Discriminatory? She's a woman? Could be. Certainly a reasonable assumption to make. So their idea that because he becomes one later, he gets the advantage of the new higher pay, I don't think really holds a lot of water, and that's, of course, our argument. Secondly, they try and say that he is somehow more experienced than her because he had six months more time with the company than she had. This is a 10% difference in pay for a six-month difference in experience. That doesn't make a lot of sense either, I think, objectively. The other part of that that falls apart is at the time the two of them are being considered early on as to who's going to get this dual-supervision job, she gets it, even though he has six months more experience. Somehow Harris has decided she is better than him at this earlier period, but then later when he gets promoted, he is suddenly better than her and entitled to the 10% more pay than she is. There's another thing I'm confused about. Can you expound on the suggestion in your brief that allowing Ms. Thaler to revoke her resignation on October 2001 was an act of retaliation? I don't know, but letting someone revoke their resignation and come back, I don't see how that's an act of retaliation. That's what I'm trying to see there. But you say that's an act of retaliation, letting her revoke her resignation. It's not that we argue things in cases and sometimes we exaggerate, but that's a specific act of retaliation. It's not a good fraud, as they call the state. What I'm trying to say is that it's part of the idea that they don't like her complaining about the pay difference between men and women. That's obvious. They then create this other issue about her relationship with this employee that never came up at the time of her relationship with the legislative branch. It only comes up as a problem for my client after she disputes this pay difference between her and the male on the judicial supervision. It becomes a retaliatory issue in which now we have something. You're attacking us about the pay. What am I going to attack you about this? A little quid pro quo, a little schoolyard tactics by Harris. So they start attacking her. Well, can you dispute the policy that you're not supposed to have a relationship with a subordinate? I mean, it seems to me that your client essentially admits that she did have a relationship with a subordinate. But then it becomes a factor later that apparently Ms. Brigham or whatever complains about your client, correct? Absolutely. All right. Is there anything in the record that indicates that Harris is trying to get her to complain about her? Well, no. Is there anything in the record that says they contact her to make a complaint? Or the way I read the record is it says she made a complaint. She divulges to my client, because they do have a relationship, that she is being encouraged to do this. And my client has said so. These things don't happen openly. It's so funny in these cases to expect claims to be able to prove all of these things that the employers can do behind closed doors and the employers have all the power to do. If we're supposed to get inside their buildings, inside their employees, inside their minds, well, we can't even talk to those people. And then those people are going to tell us honestly what's going on when their jobs are all sitting there in the defendant's hands. All right. Tell me your best argument, though. Objective, reasonable inferences. You have to look at this thing and say, what is really going on here? She complains about my client. Well, I want to know. But, see, what I want to know is what's your best argument that Thaler could state a claim under the Equal Pay Act? I don't want to hear. She's getting paid less than an hour. They have to step up and say why. Their two excuses are he works six months more and he's more experienced. He's more experienced doesn't apply because they hired her above him. That's just not a good one. Six months more, okay, maybe 10% more pay if you work there six months longer. Every one of the employees of theirs that's got six months more than another employee is getting 10% more pay. I know that isn't true. We all know that isn't true. So their two excuses to get past my client is a mistake. Now, well, why? That means I should be able to go to trial on this. They had to earn it. In fact, they didn't come up with anything. They came up with two things. That's just not going to happen. So if you go to trial, what damage figure are you going to ask for? Well, what's the difference in the wage? Obviously, then if we're successful in the retaliation of the hostile environment. Well, what's the difference in the wage, do you figure? It's about $35 an hour. Well, it's a lot of money. We only get paid $13 an hour. It's 10% more. 10%. People, you know, you can work for years for a company and get a 2% raise or a 5% raise. People don't get 10% more for six months. In the aggregate, do you know how much? Well, you have to decide how many years, et cetera, et cetera. I haven't added none of this. Obviously, we haven't gotten to the damage stage because we're playing at the Do you want to reserve your time? Do you want to reserve the remainder of your time for rebuttal? Sure. You don't have to rebut it. It's absolutely one of those cases, and it's one of those cases based on the undisputed facts. And with all due respect to Mr. McKenna, he absolutely does not know the facts. And he doesn't even say anything regarding the facts. And the facts that I'm talking about are all based on his client's deposition testimony and undisputed declarations submitted by Tara. There were three claims that issued an equal payout claim, the Title VII and the retaliation claim. And the equal payout from the Title VII claim are the same. And they conceded that. The Title VII claim is totally explicit of the equal payout claim. So those are the same legal arguments. Mr. McKenna argued that Harris has offered no explanation for the difference in pay. That is absolutely false. The explanation that Harris offered was that James Owen, who is the sole person at issue in this appeal, was promoted to the position of dual rank supervisor over two and a half years after Ms. Taylor. Ms. Taylor was promoted to that position in January 1999. And Mr. Owen was promoted to that same position in September of 2001. So we have quite a lifetime disparity there. And in that two and a half years, the pay scale for the starting wage of that supervisor portion of that position increased. We don't know exactly what it increased to, do we? Or, I mean, do we? There is a reference in the record where Ms. Taylor herself at deposition testified as to what the increase was. But Harris didn't put in the pay scale over time. You mean in evidence? Yes. To back up that statement you just made. What Harris did put in cabinet and what is undisputed by Ms. Taylor in this case is that Larry Harrison, who is the director of surveillance and security, in his declaration of paragraph 10, explains flat out, very straightforward, the reasons for the pay disparity. And he says that over time, there has increased. Can you hear me? We can hear you. Yes, but it says it might not be recording, which is the. Oh, okay. He explains in paragraph 10 of his position that the starting pay for the supervisor position had been increased over time pursuant to Harris' established pay guidelines. Well, my question was, what are those established pay guidelines? I mean, I was going to say, and I would submit that this is commonsensical, over time, companies raised concerns about what's happening in different places. And Ms. Taylor admitted that. Why is that commonsense? I have no idea. You know. Right. Well, part of the reason that it wasn't admitted into evidence as to what the specific pay scale was, I mean, at the time that this case occurred, we're going way back in time. So you're talking about a pay scale that went back a number of years. But also. And Harris doesn't have records of that? I cannot. I'm not sure, as we stand here today. But part of the reason, I'll tell you, as the person who was involved in the case, she admitted. I mean, Ms. Taylor sat there in that position, and she says, and it has a question. Was it correct that at the time that he was promoted to a dual-rate position, that's Mr. Owen, the pay scale had been increased as of April 2001 to a minimum starting wage of $13.84 at rate age 15? And she said, I looked down at it in the case, and that was her grade, correct? She says, yes. So she basically, you have it right there, her admission, that the pay scale has been increased, as Harris is asserting it was. It's an undisputed fact. There's nothing unreasonable about it. And it makes perfect sense that over time, there are raises in pay scale for various positions to account for inflation and other things. And when asked in that position, Ms. Taylor testified to that. When asked, and this is all cited in her brief, when asked flat out, would you acknowledge that timing can make a difference in the pay that someone may receive when they're promoted to a certain position, she said yes. And when asked, would you acknowledge that inflation and other factors may account for reasonable raises in the pay scale of a position, she said yes. So, you know, based on that, Mr. McKinnon has said Harris is trying to say that James Owen was, you know, had longer tenure, was unqualified, and that's why he got hired starting pay. That's really not the argument we've made. The argument we've made, and it's supported by the Federation, and it's undisputed, and it's admitted by Ms. Taylor, is that it was two and a half years later. It's like comparing apples and oranges. And the other key point, and he was asked this question by the coordinator, who was unable to respond, is that at the time she complained, in October 2001, there were only two other people holding the position of dual rank supervisor. And just so you understand, dual rank supervisor means sometimes you're a surveyor, too, and the supervisor's gone, you're a supervisor for the day the supervisor's gone. So it's sort of in a dual position. And the other two people in that position at the time of her October 2001 complaint were male. And both of those people were making less than she was. She conceded that. She justified that at the time of her October 2001 complaint, she was making more than either of those males. She was making 70 percent of that. I don't think it's working. Okay. Okay. Okay. Okay. Okay. Okay. The other thing that I want to just highlight is that because the fact that they were assigned to the same shift, well, it occurred months later, it occurred pursuant to a regular rotation in shifts, and that's undisputed. Ms. Thaler admitted that. And also, as stated in Ms. Thaler's own notes, which have been submitted as part of the record, which she authenticated at deposition and testified were true, yeah, her diary, Your Honor, she stated that when asked if she could work on the same shift as Ms. Brigham, she said yes. And Ms. Brigham at the time also stated that she could. When it worked out that after four mere shifts together, we're talking four days together, that they complained they were separated. And keep in mind also, I think it's important to note, and this is clear in the record and undisputed, parents didn't know at the time that there was this whole past relationship. They basically had been told by Ms. Brigham, you know, this woman's bothering me. Oh, she's kind of hitting at me. Then Ms. Brigham makes a formal complaint, and that starts off things. No one ever came out. Ms. Thaler never admitted. Well, you know, at one point, we were having a consensual affair. We were sleeping together. Harris had no idea that this whole relationship had been going on. If they had, maybe things would have been handled differently. But they didn't know. Why didn't they know? Because Ms. Thaler was not forthcoming. Ms. Thaler was conducting an affair in violation of policy. And then there's this employee coming forward and complaining about her. Ms. Thaler is not honest in her response to HR. And it was each thing that Ms. Thaler complains is retaliation was, in fact, Harris reacting to something that Ms. Thaler had done, reacting to Ms. Thaler's own conduct. They were reacting to the fact that, you know, Ms. Brigham complained. When Ms. Thaler had been told, don't talk to Ms. Brigham, she's entered this complaint, don't do anything that can be construed as retaliatory, as confirmed by Ms. Thaler, Ms. Thaler's own notes. She's repeatedly calling this woman at home. She's going over to visit her. I mean, she's basically digging her own grave. She's causing this woman to complain more. And, I mean, apparently she – maybe this woman, Ms. Brigham, was telling her, oh, I'm not complaining or whatever. But as she admitted at deposition, she later came to realize that Ms. Brigham was not an honest person. Ms. Brigham, she came to feel, was lying and was somehow setting her up. And now they're coming in here trying to rely on Ms. Brigham's testimony to say that, oh, Ms. Brigham somehow shows that Harris was trying to, you know, get Ms. Brigham to complain about Ms. Thaler. That couldn't be farther from the truth. And there's never been any evidence offered from Ms. Brigham. They didn't call Ms. Brigham as a witness. They didn't depose her in deposition. They haven't offered a declaration from her. All we have is Ms. Thaler saying, well, you know, I think based on what Ms. Brigham told me they were trying to get her to complain about me, to retaliate against me. Everything that happened to Ms. Thaler was a result of her own unfortunate misconduct. It's all undisputed. There's no evidence to the contrary. Roberts. Thank you for the questions. Thank you for your argument. Thank you. Just to kind of sum it up, the issue on the pay is Ms. Thaler first goes to work there. She realizes she's getting paid less than the men who are doing the same job she's doing. She complains. This is back in 1999. She complains. They fix it. They go, oh, okay, you're a female. You're getting paid less than the men. And they give her a raise. She changes her position. She's getting paid less than the men doing the same position. She complains again. They fix it. It's happening. There's a disparity in pay between men and women. Their own conduct by fixing it demonstrates she's right. But for some reason, the third time she complains, they don't fix it. They deny it, and they leave it the way it is. There is a disparity in pay between females and males doing the same job at Harrah's at this time. Self-evident, obvious, they admit it themselves by fixing it the first two times. Thank you, counsel. Thank you. The case here will be submitted. Thank both of you for your arguments. And we'll be in recess for the morning. Thank you. Thank you.
judges: Thomas, Paez, Callahan